David L. Scher, Esq.
dscher@employmentlawgroup.com
California Bar No. 184562
R. Scott Oswald, Esq. (to be admitted *pro hac vice*)
soswald@employmentlawgroup.com
The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 261-2806
(202) 261-2835 (facsimile)

2012 APR 18   AM 8: 38

CLERK U.S. DISTRICT COURT
CENTRAL DIST OF CALIF.
LOS ANGELES

BY_____

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA *ex rel.*<br>ERIC RODWELL<br>77 Tudor Street<br>Chelsea, Massachusetts 02150,<br><br>    Plaintiff,<br><br>v.<br><br>EXCELITAS TECHNOLOGIES CORP.,<br>200 West Street, E403<br>Waltham, Massachusetts 02451,<br><br>**Serve: Registered Agent:**<br><br>    National Corporate Research<br>    10 Milk Street<br>    Suite 1055<br>    Boston, Massachusetts 02108-4600,<br><br>and<br><br>PerkinElmer, Inc.<br>940 Winter Street<br>Waltham, Massachusetts 02451-1457, | **CV12-3346** - GW<br>(MANX)<br><br>**Case No.** _____<br>**FILED UNDER SEAL**<br>Pursuant to 31 U.S.C. § 3730<br>(False Claims Act)<br><br>**JURY TRIAL DEMANDED** |

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

FALSE CLAIM ACT *QUI TAM* COMPLAINT UNDER SEAL

CASE NO._____

**Serve: Registered Agent** )
                                    )
  C T Corporation System )
  155 Federal Street )
  Suite 700 )
  Boston, Massachusetts 02110-1727, )
                                    )
  Defendants. )
_____)

## Introduction

1.  Qui tam relator Eric Rodwell ("Rodwell" or "Relator"), by his attorneys, on behalf of the United States of America, files this complaint against Excelitas Technologies Corp., ("Excelitas") and PerkinElmer, Inc., ("PerkinElmer," collectively "Defendants") to recover damages, penalties, and attorneys' fees for violations of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA") committed by the Defendants.

2.  PerkinElmer owned Excelitas until the fall of 2010, when it sold Excelitas to venture capital firm Veritas Capital III, LP for approximately $500 million.

3.  Prior to the sale, Excelitas was known as PerkinElmer's Illumination and Detection Solutions ("IDS") business unit.

4.  The Defendants bid on and were awarded numerous contracts for the sale of an electronic component known as a thyratron to the Federal Government and several government contractors.

5.  A thyratron is a gas filled tube which functions as a high speed, high energy electrical switch.

6.  Thyratrons are commonly used in high-power pulsed radar equipment, high-energy lasers, x-ray machines, radiation therapy devices, and other military and scientific applications.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

---

FALSE CLAIM ACT *QUI TAM* COMPLAINT UNDER SEAL

CASE NO._____

7. The thyratrons sold by the Defendants are used in military aircraft such as the new F-35 Lightening II Joint Strike Fighter, C-5 Galaxy, E-3 AWACS, and C-130. Thyratrons sold by the Defendants are also used in x-ray scanners depended on by the Transportation Safety Administration.

8. Thyratrons sold by the Defendants are standardized under the National Stock Number ("NSN") system and many are subject to military-specifications ("Mil-Spec") or published industry standards.

9. The contracts awarded to the Defendants require that the thyratrons sold by the Defendants meet NSN, Mil-Spec, and industry standards and require 100 percent quality control testing, which functions as an initial burn-in or break-in period, and is part of the manufacturing process. The Defendants contracts also require mandatory aging periods.

10. The Defendants intentionally sold the Government and government contractors thyratrons which were assembled with the wrong parts or were otherwise defective and failed quality control testing.

11. The Defendants also failed to properly test and age the thyratrons sold to the Government and government contractors. To conceal the defects in the thyratrons as well as their failure to properly test and age the thyratrons, the Defendants created and submitted fake testing data to the Government and government contractors.

12. The Defendants sold the Government and government contractors over 10,000 defective, untested, or unaged thyratrons worth over $13 million.

13. The Defendants' fraudulent acts resulted in the payment of millions of dollars and induced the Government and government contractors to extend existing contracts and award new contracts to the Defendants.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

---

FALSE CLAIM ACT *QUI TAM* COMPLAINT UNDER SEAL

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

14.     Relator Rodwell was employed by Excelitas from April 13, 2011 until January 6, 2012. During his employment, Rodwell witnessed Excelitas assemble thyratrons with the wrong parts, falsify testing information, skip vital steps in the testing and aging of thyratrons, and intentionally ship defective and noncompliant thyratrons to the Government and government contractors. Rodwell also watched his supervisors prepare false information in response to an audit conducted by the United States Navy and Lockheed Martin, Corp.  Rodwell learned from his co-workers that the violations of the FCA described in this complaint have been ongoing for at least the past 13 years, including during the times that Excelitas was owned and operated by PerkinElmer.

## Jurisdiction and Venue

15.     This Court has subject matter jurisdiction over this action under 31 U.S.C. §§ 3730 and 3732.

16.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732 (a) because Excelitas maintains offices located at 1330 East Cypress Street, Covina, California 21724, and because at least some of the fraudulent acts referenced herein occurred in this district.

17.     Venue is proper in this District pursuant to 31 U.S.C. § 3732 (a), and under 28 U.S.C. § 1391(b) because Excelitas maintains an office in this District and is doing business in this District, and because at least some of the fraudulent acts referenced herein occurred in this district.

## Parties

18.     Relator Eric Rodwell is a citizen of the United States and resident of Massachusetts. Rodwell brings this civil action for violations of 31 U.S.C. § 3729 (a)(1)(A) and (B) for himself and for the United States Government pursuant to 31 U.S.C. § 3730 (b)(1).  Rodwell was a

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

1  subcontractor for and employee of Excelitas from April 13, 2011 until January 6, 2012, where he

2  worked as a thyratron assembler and high voltage tester ("thyratron tester").

3     19.     Excelitas is a Delaware corporation headquartered in Waltham, Massachusetts with

4  offices in Covina, California, among other locations.

5     20.     PerkinElmer, former owner of Excelitas, is a Massachusetts corporation with its

6  headquarters in Waltham, Massachusetts

7

8                        **FACTUAL ALLEGATIONS**

9  **The Defendants Sell Thyratrons to the Government and Government Contractors.**

10    21.     During the last six years, the Defendants sold approximately 4,859 thyratrons

11 directly to the Government, and roughly two times that number to government contractors, at a cost

12 of up to $6,000 per thyratron.

13    22.     The approximately 4,859 thyratrons sold directly to the Government were sold under

14 contracts awarded through the Government's competitive bidding program.

15    23.     The solicitations published by the Government generally request a certain quantity of

16 a particular model of thyratron identified by its National Stock Number ("NSN").

17    24.     A NSN is the official label applied to an item of supply that is repeatedly procured,

18 stocked, stored, issued, and used throughout the federal supply system.

19    25.     A NSN is a unique series of numbers assigned by the Defense Logistics Agency to

20 identify a specific item.

21    26.     When an NSN number is assigned, data elements such as the item's name,

22 manufacturer's part number, and physical and performance characteristics are recorded.

23    27.     A NSN is a way of standardizing items repeatedly purchased by the Government and

24 frequently produced by multiple manufacturers.

25

26

27

28

28.     NSNs are cross referenced by the Government and frequently also refer to Mil-Spec requirements or industry standards, such as those published by the international Electronic Industries Alliance "EIA" standards.

29.     All of the thyratrons sold to the Government by the Defendants have NSNs. Most also have Mil-Spec or are also subject to EIA standards.

30.     The Mil-Spec standards for thyratrons contain mandatory testing processes as well as mandatory holding periods between testing stages.

31.     The Defendants submitted quotations or bids in response to the Government's solicitations and actually or impliedly certified that the thyratrons that the Defendants would supply in response to these solicitations complied with NSN, Mil-Spec, or EIA standards.

32.     Relying on the Defendants' certifications, the Government awarded numerous contracts to the Defendants for the sale of thyratrons

33.     Contracts awarded to the Defendants include but are not limited to contract numbers: SPM7M512M0965, SPM7M512M0253, SPM7M512M0025, SPM7M511M3978, SPM7MX10D7057, SPM7M511M3491, SPM7M511M3115, SPM7M511M1822, SPM7M510D7005, SPM7MC11M1458, SPM7M510M4172, SPM7M508D5024, SPM7M510M3844, and SPM7M510M3537.

34.     The total value of government contracts awarded to the Defendants over the last six years for the sale of thyratrons is approximately $4,386,631.22.

35.     Some of the contracts awarded to the Defendants by the Government, including SPM7M510R0036, are indefinite quantity contracts with the option to extend the contract for multiple years.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

36.     Relying on the Defendants' false certifications that the products delivered under the contracts were compliant, the Government executed multiple purchase orders, exercised options to extend indefinite quantity contracts, and made payments to the Defendants.

37.     Relying on the Defendants' false certifications that the products delivered under various contracts are compliant, several government contractors made payments, submitted additional purchase orders, and executed subsequent contracts with the Defendants.

**Thyratrons.**

38.     A thyratron is a gas filled tube which uses gas, in this case hydrogen, as switching medium to open or close an electrical circuit.

39.     A basic thyratron has an anode at the top and a cathode at the bottom. In between the anode and cathode is a grid.

40.     While the hydrogen is in a neutral state, it does not conduct electricity, leaving a circuit containing a thyratron incomplete.

41.     Applying a charge to the grid ionizes the hydrogen and creates plasma, allowing electrons to flow from the anode to the cathode and completing the circuit. When power to the grid is turned off, the hydrogen de-ionizes and electricity stops flowing through the thyratron. This process of di-ionization is known as "recovery."

42.     While filled with plasma, thyratrons sometimes make noise and may glow different colors depending on the type of gas used.

43.     Thyratrons require a multi-stage burn-in, aging, and testing process to ensure their dependability. These requirements are spelled out in detail in Mil-Spec and other publications.

44.     Modern thyratrons, such as those sold by the Defendants, are capable of switching tens of thousands of volts and tens of kiloamperes.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

45.   Modern thyratrons frequently contain multiple grids, baffles to prevent high-velocity electrons from damaging electrodes, vanes to normalize the flow of plasma, gas reservoirs, and heaters.

**Rodwell's Work at Excelitas.**

46.   Excelitas hired Rodwell as a temporary worker to assemble thyratrons on or about April 13, 2011.

47.   Throughout his employment, Rodwell was supervised by Fred Catino ("Catino").

48.   During his first couple of months at Excelitas, Rodwell learned how to assemble various thyratron assemblies, including disks which contain a heater, cathode, and grounding pins.

49.   Rodwell also learned how to finish thyratrons by silk screening the name and model onto the tube's ceramic body, attaching electrical leads and hardware, and packaging the final product.

50.   Rodwell's work as a thyratron assembler was guided by documents known as routers and mini-routers.

51.   A router is a two to three page document which provides mandatory step-by-step instruction on the assembling and testing for each thyratron.  Routers contain references to diagrams, military specifications, assembly printouts, and parts lists for each subassembly of a thyratron.

52.   Each thyratron has its own router which follows it through all stages of assembly and testing, from infancy to shipping.

53.   At the end of the production process the thyratron tester records test data in the router.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

54. Excelitas summarizes testing data as "pass or fail," and gives it to the Government in a separate document.

55. While working as a thyratron assembler, Rodwell's supervisors instructed him to assemble thyratrons with incorrect parts due to supply chain and other problems.

56. In or about June 2010, Cory Ouellette, the thyratron tester, resigned from his position and moved to the shipping department.

57. At the instruction of Catino, Ouellette trained Rodwell as his replacement for about a month.

58. While working as a thyratron tester, Rodwell's supervisors instructed him to approve thyratrons that fell far outside of the contractually required performance requirements.

59. Rodwell's supervisors also instructed Rodwell to approve thyratrons exhibiting defects known to be caused by the use of substitute and non-compliant parts.

60. On several occasions, Catino and others told Rodwell that he must first consult with Catino before failing a thyratron during the testing process.

61. Testing is also part of the process of manufacturing a thyratron, as it burns contaminates out and functions like a break-in period.

62. An untested and un-aged thyratron is an incomplete product.

63. Rodwell's supervisors routinely told him to skip testing and to record fake testing data.

64. Rodwell voiced his objections to Excelitas' fraudulent practices on several occasions, but his complaints fell on deaf ears.

65. After witnessing Catino alter and forge data in preparation for a Government audit, and fearing that he was being used to perpetuate fraud, Rodwell resigned on January 6, 2012.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

---

**FALSE CLAIM ACT *QUI TAM* COMPLAINT UNDER SEAL**

CASE NO._____

**Excelitas Assembles Thyratrons with Incorrect Parts and Intentionally Delivers Defective Products to the Government and Government Contractors.**

66.     While working as a thyratron assembler from April 13, 2011 until approximately June 1011, Rodwell received instructions from Catino and Catino's manager, Tony Cusamano ("Cusamano"), to deviate from the routers and assemble thyratrons with substitute parts.

67.     Catino and Cusamano also instructed other employees to use substitute parts on several occasions.

68.     Rodwell asked Catino about the use of unlisted substitute parts, and Catino told Rodwell "don't worry about it, we use whatever parts will work," or something to that effect.

69.     At no time was the use of substitute, non-compliant parts documented or disclosed to customers or the Government.

70.     Rodwell discussed the use of substitute parts with his coworkers. Rodwell's co-workers to him that this practice has been going on for upwards of ten years.

71.     After becoming a thyratron tester, Rodwell learned about the impact of using substitute parts.

72.     In November 2011, while testing a batch of three HY-3002V and three HY-3002 thyratrons, Rodwell became concerned because the plasma fields of the HY-3002Vs did not look or sound right. The plasma fields appeared much larger and closer to red than the usual amber color.

73.     The HY-3002V models also kicked out at around 18 kV, despite router specifications which require the HY-3002V to function at up to 25 kV.

74.     "Kicking out" is a term used by Excelitas employees to describe what happens when too many electrons concentrate in one area of a tube, causing a thyratron to draw too much current and causing a testing machine's circuit breaker to "kick out."

FALSE CLAIM ACT *QUI TAM* COMPLAINT UNDER SEAL

CASE NO. _____

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

75.     Rodwell reported his observations of the HY-3002Vs to Catino.  Catino told Rodwell to "do what you can to get them out the door."

76.     Rodwell continued to observe problems with the HY-3002Vs and again complained to Catino.  Catino explained to Rodwell that Cusamano had authorized him to "do what it takes to pass the tubes," and stated that Excelitas could not scrap any tubes since it did not have any parts to rebuild replacement and could not afford to delay its delivery to the customer.

77.     Catino subsequently recorded false testing information on the routers and approved the defective thyratrons to ship.

78.     Upset that defective products would be sent out the door, Rodwell went over Catino and Cusamano's heads to the Lead Engineer, Fred Newman ("Newman").

79.     After Rodwell explained the situation, Newman came over to the testing area where he confirmed Rodwell's observations but dismissed them as "just a variable that happens."

80.     Rodwell persisted that Newman look into the issues.  Newman eventually relented and instructed Rodwell to remove one of the HY-3002Vs from the testing machine so he could examine it.

81.     After the thyratron cooled for about an hour, Newman used a hammer to crack the ceramic casing in half.  After examining the thyratron for approximately 30 minutes, Newman was unable to determine the cause of the unusual behavior.

82.     Rodwell restated his observations and Newman then began to reassemble the thyratron.  While reassembling the thyratron, Newman remarked that it was assembled with the incorrect grid cup.

83.     Using the wrong grid cup caused the thyratron to generate a plasma field approximately one half inch long, instead of the proper one quarter inch.

---

FALSE CLAIM ACT *QUI TAM* COMPLAINT UNDER SEAL

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

84.     Despite Newman's confirmation that the batch of HY-3002V thyratrons was defective, Catino shipped the remaining two anyway and told Rodwell that "we'll deal with the tubes if they come back," or something to that effect.

85.     Rodwell later discussed the above incident with his predecessor, Ouellette. Ouellette told Rodwell that the HY-3002Vs virtually always have problems, leading Rodwell to worry that all of the HY-3002V thyratrons are assembled with the incorrect parts.

86.     Ouellette also stated that continued and systematic deviation from the testing procedures and pressure to falsify data were the primary motivating factors behind his decision to resign.

**Excelitas Intentionally Sells Thyratrons that Fail to Meet Hold-Off Voltage Requirements.**

87.     The first step in testing a thyratron after assembly is DC Modulation, also known as burn-in.

88.     During DC Modulation, intermittent voltage is applied to the cathode, heater, and anode, but the grid is left unpowered. Lower voltage is applied to the heater and cathode while up to 40 kV is applied to the anode.

89.     As the voltage increases, contaminates and impurities inside the thyratron burn and conduct electrons between the anode and cathode without the ionization of the gas, allowing current to pass through the tube without charging the grid.

90.     During the testing process, voltage is increased until any contaminates and impurities are burned out and the thyratron can hold off its maximum rated voltage without current flowing through it.

FALSE CLAIM ACT *QUI TAM* COMPLAINT UNDER SEAL

CASE NO._____

91.    On several occasions, Rodwell tested tubes with contaminates and impurities that could not be burned out, and which exhibited a condition called "self-conducting." A self-conducting tube should fail testing.

92.    Catino instructed Rodwell to pass self-conducting thyratrons despite their failure to meet contractual, mil-spec, and industry standard requirements.

93.    Rodwell discussed the problems of self-conducting thyratrons with Ouellette and another former thyratron tester named Chris Kendal ("Kendal").

94.    Ouellette and Kendal informed Rodwell that self-conducting has been an ongoing problem for many years, and that while no one is sure of the cause, it is likely caused by a defect in the ceramic spray applied to the vanes above the plasma field.

95.    Defects and impurities in the ceramics of a thyratron can cause superheated spots which fatigue and eventually crack the ceramic.

96.    Self-conducting frequently occurs in other models including the HY-1A and HY-1OR, which are commonly used in airport x-ray machines.

97.    Between March 12, 2010 and February 13, 2012, Excelitas sold at least 351 HY-1OR thyratrons to the Government at a cost of $424,577.22.

98.    Model HY-11T also commonly exhibits self-conducting during testing.

99.    Between June 2006 and January 2012, Excelitas sold at least 1,367 HY-11T thyratrons to the Government at a cost of $1,637,589

100.    The Defendants also sold approximately 1,000 HY-11T thyratrons to Lockheed Martin primarily for use in military aircraft.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

**Excelitas Intentionally Sells Thyratrons that Suffer From Latching.**

101.    Another problem commonly exposed at the end of the DC Modulating stage is called latching.

102.    Latching occurs when a thyratron becomes stuck in either an open or closed state, and either continues to conduct electricity after being deactivated, or refuses to conduct electricity at lower levels of voltage within its specified operating range.

103.    Latching can be caused by too little hydrogen or by impurities and contaminates that cause hydrogen to remain ionized and conductive after the grid is turned off.

104.    Rodwell became concerned in or about late October 2011 after several HY-5G thyratrons exhibited latching.

105.    The testing procedures for the HY-5G required Rodwell to apply current to the heater and grid, and then to slowly increase power to the cathode and anode. At approximately 12 – 15 kV, the HY-5Gs that Rodwell was testing began to latch.

106.    Rodwell brought the latching to the attention of Catino.

107.    Catino then pulled the routers from a previous batch of HY-5G thyratrons and copied the testing data from the old batch onto the documents for the new batch and made Rodwell sign off on the testing as complete.

108.    Excelitas subsequently submitted the false testing data with this batch of HY-5Gs to the Government and delivered the defective thyratrons.

109.    On at least one occasion around late October 2011, Rodwell discussed the latching problems of the HY-5 series thyratrons with his co-workers. Rodwell's co-workers told him that latching is a very common problem with the HY-5 series and other models.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

110.     Rodwell's co-workers also stated that the pumping equipment used to evacuate air from the thyratrons and insert hydrogen is old and suffers from mechanical problems, frequently causing an insufficient volume of hydrogen to be pumped inside the thyratrons.

111.     If a thyratron has problems with an insufficient volume of hydrogen, it is possible to re-pump it. However, Excelitas frequently fails to re-pump problematic thyratrons because doing so slows down production.

112.     Additionally, government specifications for the HY-5G require it to remain sealed after assembly.

113.     Excelitas frequently ships HY-5G and other thyratrons to the Government and government contractors which exhibit characteristics consistent with an insufficient volume of hydrogen.

114.     Around the same time that Rodwell observed the latching issues with the HY-5G thyratrons, Excelitas introduced a new computerized time keeping system and granted computer access to Rodwell and other temporary workers.

115.     While exploring the information made available on the computer, Rodwell came across several contract documents and other specifications. Rodwell did not have the opportunity to review all of the documents, but he did see information requiring 100 percent quality control testing, and was able to read enough information to determine that there is no flexibility in the testing and aging requirements.

116.     Rodwell also verified the testing requirements with Ouellette, Kendal, and other co-workers.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

FALSE CLAIM ACT *QUI TAM* COMPLAINT UNDER SEAL

CASE NO._____

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

117.    Rodwell became concerned that Catino and Cusamano's practices were serious violations of the company's government contracts.  Rodwell then told Newman about the problems with latching.

118.    Newman instructed Rodwell to continue to try to burn-in the thyratrons.  After additional burn-in time failed, Newman told Rodwell to proceed to the second testing process known as DC Aging since it's impossible to re-pump a HY-5 series thyratron without leaving physical evidence.

119.    Due to defects in their construction, the thyratrons failed the DC Aging process repeatedly.  Catino then recorded false testing information and sent defective HY-5Gs to the Government.

120.    This defective batch of thyratrons apparently failed in the field and triggered an audit by the Department of the Navy and Lockheed Martin.

121.    Excelitas sold at least 148 HY-5G thyratrons to the government at a cost of over $397,000.

122.    Excelitas sold approximately 300 more HY-5 and HY-5G thyratrons to other government agencies or contractors at a cost of up to $6,000 each.

**Excelitas Intentionally Sells Thyratron that Overload at Below Their Published and Contractually Required Maximum Power Handling Capacities.**

123.    The second stage of the seven step testing and aging process is called DC Aging.

124.    During DC Aging, the grid is energized ionizing the hydrogen.  High voltage is applied to the anode and cathode in a fashion prescribed by the router and unique to each model of thyratron.

125.    A thyratron passes the DC Aging process if it can operate at the prescribed voltages for prescribed time periods without kicking out more than once per hour.

126.    While testing the batch of HY-5 and HY-5G thyratrons described in paragraphs 104 through 108, Rodwell witnessed every thyratron in the batch kick out upwards of once every two minutes.

127.    Rodwell informed his supervisors that the HY-5G thyratrons also failed the DC Aging process and was again instructed to approve them regardless.

128.    During his tenure at Excelitas, Rodwell witnessed countless other thyratrons fail during DC Aging, including a large number of HY-8613 and HY-1A thyratrons.

129.    As with the HY-5G thyratrons, Catino instructed Rodwell to approve failing HY-8613 and HY-1A thyratrons.

### Excelitas Skips Mandatory Testing to Avoid Paying Overtime.

130.    In or around the first week of December, Rodwell got into a heated argument with Cusamano. Rodwell was upset because Catino and Cusamano instructed him once again to batch test thyratrons by testing only two HY-5G thyratrons out of a batch of approximately ten. Rodwell was instructed to make up fake data to record for the remaining untested thyratrons.

131.    After Rodwell insisted on performing the proper full testing, Cusamano told him that the department could not afford to pay the overtime required to properly test the entire order and instructed him again not to complete the testing.

132.    The order subsequently shipped with the majority of the thyratrons having not undergone any testing or aging required for dependable operation.

133.    Upset over the continuing pressure to falsify testing data and ship defective products for use by the military, Rodwell began to secretly record personal notes on the routers for some of the thyratrons he tested.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

134. Rodwell's notes documented defects that he witnessed and contradicted the testing information. Rodwell also began to leave some testing data blank.

135. Catino noticed what Rodwell was doing and severely chastised him. Catino also went behind Rodwell and started filling in false test information which Rodwell previously left blank.

**Excelitas Skips Required Testing and Aging Steps and Sells Thyratrons That Fail Their Final Testing and Aging Process.**

136. Another type of mandatory testing is called Time Jitter or Jitter Testing.

137. Excelitas routinely skips Jitter Testing, which is described by Catino and others as "not needed because it never causes a problem."

138. Catino told Rodwell that Jitter Testing is too time consuming and that the results generally stay the same.

139. Catino instructed Rodwell to record fake results to make it appear as though Jitter Test was performed.

140. The requirement for Jitter Testing can be found in numerous Mil-Spec and industry standards, including MIL-PRF-1/1612B.

141. Contractual, Mil-Spec, and industry standards also call for a 96 hour holding period before the final stage of testing and aging.

142. An example of the mandatory 96 hour holding period can also be found in Mil-Prf-1/1612B.

143. Excelitas frequently reduces or completely eliminates the holding period to save time in its manufacturing process.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

144.    During final testing, a thyratron is left on at full power for a predetermined time listed in its router. Depending on the model, the thyratron may be required to go the entire duration without kicking out, or may only kick out a limited number of times.

145.    During Rodwell's tenure as a thyratron tester, he witnessed thousands of thyratrons fail during final testing, sometimes kicking out as frequently as once every couple minutes. Excelitas shipped these defective thyratrons and concealed their failures.

### Excelitas Falsified Information Provided During a Government Audit.

146.    On or about December 8, 2011, Rodwell learned from others at work that the Navy and Lockheed would be conducting an audit on December 22, 2011.

147.    On or about the same day, Rodwell attended a departmental meeting in which Catino said "we need to pull all the previous data for the HY-5s."

148.    Catino then went into the filing cabinets in the shipping area and pulled old routers and testing data which he brought to his desk near Rodwell and Kendal's workspace.

149.    Rodwell and Kendal watched as Catino appeared to change testing data and backfill missing information on previously shipped orders.

150.    Rodwell overheard that one of management's major concerns was that the auditors would find identical testing data from different dates recorded for multiple orders, something that is highly unlikely and would certainly raise suspicion.

151.    On December 22, 2011, Rodwell approached one of the managers overseeing the audit and offered to allow the auditors to witness the testing of HY-5G thyratrons.

152.    Knowing that the thyratrons would fail their testing, Rodwell hoped the auditors would catch Excelitas red handed. The manager declined and later pulled Rodwell aside and said something to the effect of "don't ever do that again, that could get us in trouble and even arrested."

---

**FALSE CLAIM ACT *QUI TAM* COMPLAINT UNDER SEAL**

CASE NO._____

153.   In the days just before the audit and during the audit, Rodwell overheard Catino, Cusamano, and other managers talking about how much trouble they could get into if the auditors uncovered all of the problems.

154.   Two weeks later, on January 6, 2012, Rodwell resigned from his position.

### Count I:  False Claims Act Violations
### 31 U.S.C. § 3729(a)(1)(A) and (a)(1)(B)
### Against All Defendants

155.   Rodwell realleges and incorporates by reference the allegations made in all proceeding paragraphs of this complaint.

156.   Defendants, by and through their officers, agents, supervisors, and employees, knowingly presented or caused to be presented to the United States false or fraudulent claims, and intentionally concealed material facts, in order to obtain payment or approval of numerous contracts in violation of the FCA.

157.   The United States, unaware of the falsity of the records, statements, and claims submitted by the Defendants, was substantially damaged and paid money to the Defendants that it otherwise would not have paid if the truth were known.

158.   The United States also awarded and exercised contract options to extend existing contracts with the Defendants in reliance on the false claims and information intentionally submitted by the Defendants.

159.   By reason of the payment made by the United States and its contractors to the Defendants as a result of the Defendants' fraud, the United States has been damaged in the amount of millions of dollars and continues to be damaged.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

160.    By reason of equipment failures and other problems caused by the Defendants' intentional sale of defective thyratrons, the United States has been damaged in the amount of millions of dollars and continues to be damaged.

## **PRAYER FOR RELIEF**

WHEREFORE, Relator prays, on behalf of the United States and himself that, on final trial of this case, judgment be entered in favor the United States and against Defendants as follows:

1.  On the First Cause of Action under the False Claims Act, as amended, for the amount of the United States' damages, multiplied as required by law, and for such civil penalties as are allowed by law.

2.  For the costs or this action, prejudgment interest, interest on the judgment and for any other and further relief to which the United States, and Relator may be justly entitled.

Respectfully submitted,
THE EMPLOYMENT LAW GROUP

By: _____

David L. Scher, Esq.
California Bar No. 184562
R. Scott Oswald, Esq. (to be admitted *pro hac vice*)
The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 261-2802
(202) 261-2835 (facsimile)
dscher@employmentlawgroup.com
soswald@employmentlawgroup.com

Attorneys for *Qui Tam* Plaintiff

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

FALSE CLAIM ACT *QUI TAM* COMPLAINT UNDER SEAL

CASE NO._____

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and pursuant to the local rules of this Court, the Relator demands a jury trial as to all issues so triable.

Dated:  April 13, 2013,

Respectfully submitted,

THE EMPLOYMENT LAW GROUP, PC

By: _____

David L. Scher, Esq.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

FALSE CLAIM ACT *QUI TAM* COMPLAINT UNDER SEAL

CASE NO._____