UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.*, <br> ERIC RODWELL <br><br> Plaintiffs, <br><br> v. <br><br> EXCELITAS TECHNOLOGIES, CORP. <br> and PERKINELMER, INC. <br><br> Defendants. | * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * <br> * Civil Action No. 1:13-cv-10963-IT |

MEMORANDUM & ORDER

June 16, 2015

TALWANI, D.J.

I.  Background

This *qui tam* action involves allegations that a government contractor defrauded the United States and other government contractors when it sold to them electronic components known as thyratrons that were either defective or not properly tested in accordance with certain specifications and standards. Presently before the court are Defendant Excelitas Technologies, Corp.'s ("Excelitas") Motion to Dismiss [#57] and Defendant PerkinElmer, Inc.'s ("PerkinElmer") Motion to Dismiss [#69]. For the reasons provided below, Excelitas' motion is DENIED and PerkinElmer's motion is ALLOWED.

II. Facts[1]

Plaintiff-Relator Rodwell was employed by Excelitas from April 2011 until January 2012 as a temporary worker to assemble thyratrons. Compl. ¶¶ 14, 46. A thyratron is a gas-filled tube which functions as a high speed electrical switch that is commonly used in high-power pulsed radar equipment, high-energy lasers, x-ray machines, radiation therapy devices, and other military and scientific applications. Id. ¶¶ 5-6. A basic thyratron has an anode at the top and a cathode at the bottom. Id. § 39. In between the anode and cathode is a grid which uses gas, in this case hydrogen, "as [a] switching medium to open or close an electrical circuit." Id. § 38-39. When a charge is applied to the grid, the hydrogen is ionized and plasma is created, which allows electrons to flow from the anode to the cathode, thereby completing the circuit. Id. § 41. Modern thyratrons may contain multiple grids and are capable of switching tens of thousands of volts. Id. § 44-45. Defendants allegedly sold thyratrons to the United States (hereinafter also referred to as the "Government") for use, among others, in military aircraft and x-ray scanners. Id. ¶ 7.

  *A. Contracts to Sell Thyratrons*

During the last six years, Rodwell alleges that Defendants sold approximately 4,859 thyratrons directly to the Government at a cost of $6,000 per thyratron and a total value of over $4 million. Id. § 21, 34. These thyratrons were sold through contracts awarded through the Government's competitive bidding program. Id. § 22. Rodwell lists some of these contracts by number in his complaint. See id. § 33.

---

[1] Because the issues analyzed here arise in the context of a motion to dismiss, this court presents the facts as they are related in Plaintiff-Relator Rodwell's complaint, see Trans-Spec Truck Serv., Inc. v. Caterpillar, Inc., 524 F.3d 315, 321 (1st Cir. 2008), and construes those facts in the light most favorable to him, see Pettengill v. Curtis, 584 F. Supp. 2d 348, 362 (D. Mass. 2008) (quoting Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 96 (1st Cir. 2007)).

2

Rodwell alleges that in soliciting contractors to fulfill these contracts, "[t]he solicitations published by the Government generally request a certain quantity of a particular model of thyratrons identified by its National Stock Number ("NSN")." Id. § 23.  A NSN is the official label applied to a supply item, which standardizes items repeatedly purchased and used throughout the federal supply system.  Id. §§ 24-27.  When an NSN number is assigned, certain data such as the items name, manufacturer's part number, and physical and performance characteristics are recorded.  Id. § 26.  Rodwell alleges that "NSNs are cross referenced by the Government and frequently also refer to Mil-Spec [military specification] requirements or industry standards, such as those published by the international Electronic Industries Alliance 'EIA' standards."  Id. § 28.  Rodwell asserts that all of the thyratrons that Defendants sold to the Government have NSNs, and that "most also have Mil-Spec or are also subject to EIA standards."  Id. § 29.

Mil-Spec standards for thyratrons, Rodwell alleges, "contain mandatory testing processes as well as mandatory holding periods between testing stages."  Id. § 30.  Rodwell also alleges that while exploring information made available on a company computer, he came across several contract documents and other specifications "requiring 100 percent quality control testing."  Id. § 115.  Rodwell was "able to read enough information to determine that there is no flexibility in the testing and aging requirements," id., and he also verified the testing requirements with his co-workers, id. § 116.

In response to the Government's solicitations for bids, Rodwell alleges that Defendants "actually or implicitly certified that the thyratrons that the Defendants would supply . . . complied with NSN, Mil-Spec, or EIA standards."  Id. § 31.  Allegedly relying on these certifications, the Government awarded numerous contracts to Defendants or exercised

3

options to extend indefinite quantity contracts. Id. § 32, 36. Rodwell also alleges that the Government made payments to Defendants based on their false certifications that the products delivered under the contracts were compliant with these standards. Id. § 37.

    *B.    Fraudulent Conduct*

Rodwell alleges that Defendants defrauded the Government by intentionally selling the Government thyratrons that were assembled with wrong parts, were defective, failed quality control testing, and were not properly tested and aged. Id. ¶¶ 10-11. Rodwell alleges, for instance, that his supervisors instructed him and other employees to assemble thyratrons with substitute, non-compliant parts, which resulted in defective products being shipped to the Government. Id. §§66-84. He recounts in the complaint how a certain batch of thyratrons contained plasma fields that appeared abnormal and malfunctioned at 18 kV despite the router specifications which required that particular batch of thyratrons to function up to 25 kV. Id. § 72-74. When Rodwell reported these issues to his supervisor, his supervisor told him to "do what you can to get them out the door." Id. § 75. After he reported the issue up his reporting line, a supervisor inspected the thyratron and remarked that it had been assembled with an incorrect grid cup. Id. § 82. Despite these issues, Defendants shipped these defective thyratrons and told Rodwell that they would "'deal with the tubes if they come back' or something to that effect." Id. § 84.

Rodwell also alleges that Defendants intentionally sold thyratrons that failed to meet certain requirements. According to Rodwell, thyratrons require a multi-stage burn-in, aging, and testing process to test the product's dependability—requirements that "are spelled out in detail in Mil-Spec and other publications." Id. § 43. First, Rodwell describes how Defendants sold thyratrons that failed the first step in testing, known as DC Modulation. Id. § 87. During DC

4

Modulation, voltage is applied to the cathode, heater, and anode parts of the thyratrons, but the grid is left unpowered.  Id. § 88.  As more power is applied, contaminates and impurities inside the thryratron burn and conduct electrons between the anode and cathode without ionizing the gas, causing current to pass through the tube without charging the grid.  Id. § 89.  On several occasions, Rodwell tested tubes that could not be burned out and which exhibited a condition called "self conducting."  Id. § 91.  Despite these results, Rodwell was instructed to pass these self-conducting thyratrons "despite their failure to meet contractual, mil-spec, and industry standard requirements."  Id. § 92.

Rodwell also details the latching issues that occurred at the DC Modulation stage.  Latching occurs when a thyratron becomes stuck in either an open or closed state.  Id. § 102.  In October 2011, after several thyratrons exhibited latching, Rodwell brought the issue to the attention of his supervisor.  Id. § 104-106.  According to Rodwell, his supervisor copied testing data from an old batch of thyratrons onto the documents for the new batch and made him sign off on the testing as complete.  Id. § 107.  Rodwell alleges that "Excelitas subsequently submitted the false testing data" and delivered the defective thyratrons to the Government.  Id. § 108.

Rodwell alleges further deficiencies in the thyratrons delivered pursuant to Excelitas' contracts with the Government.  For instance, Excelitas allegedly shipped thyratrons containing insufficient volumes of hydrogen.  See id. §§ 110-113.  In another allegation, Rodwell claims that he was instructed to approve thyratrons that failed to operate at certain prescribed voltages for prescribed time periods.  Id. § 126-129.  He also alleges that Excelitas skipped mandatory testing to avoid paying overtime.  Id. § 130-131.  As described above, Defendants allegedly concealed these issues by creating and submitting fake testing data to the Government as well as falsifying information provided during a Government audit, id. § 146-153.

5

Through these actions, Defendants allegedly violated terms of the contracts that the Government had awarded them through its competitive bidding program. Id. ¶ 9, 22, 31-37. Rodwell also generally alleges that Excelitas gave the Government documents that inaccurately summarized testing data. See id. § 54.

III. Discussion

In its motion to dismiss, Excelitas seeks to dismiss Rodwell's complaint for failing under the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) to link the alleged fraudulent conduct to the submission of a false claim for payment. PerkinElmer adopts Excelitas' arguments in its own motion to dismiss and also argues that the complaint contains no particularized allegations that it engaged in fraudulent conduct or submitted false claims to the Government.

    *A. Pleading Standards Under Rule 9(b)*

Rodwell's claim under the False Claims Act ("FCA") is subject to the heightened pleading requirements of Rule 9(b). Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Rule 9(b) further provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Thus, although a defendant's mental state may be plead generally, "the details of the actual presentation of false or fraudulent claims to the government can and must be pled with particularity in order to meet the requirements of Rule 9(b)." United States ex rel. Karvelas v. Melrose–Wakefield Hosp., 360 F.3d 220, 228–232 (1st Cir. 2004) (rejecting argument that Rule 9(b)'s "requirements should be relaxed . . . because the information necessary to plead with particularity is within the possession and control of the defendants").

6

The First Circuit has provided examples of "the types of information that may help a relator to state his or her claims with particularity." Id. at 233. These examples include "the dates of the claims, the content of the forms or bills submitted, their identification numbers, the amount of money charged to the government, the particular goods or services for which the government was billed, the individuals involved in the billing, and the length of time between the alleged fraudulent practices and the submission of claims based on those practices." Id. A plaintiff is not required to plead all of these details in a complaint, but "some of this information for at least some of the claims must be pleaded in order to satisfy Rule 9(b)." Id. (quotation marks and citations omitted). Likewise, a plaintiff need not produce the actual documentation in which a false claim was made, but must "describe with particularity some of the documents containing false claims for payment that the defendants allegedly submitted to the United States." Id. at 230 n.11; see also United States ex rel. Ge v. Takeda Pharm. Co. Ltd., 737 F.3d 116, 124 (1st Cir. 2013) (holding that sufficient allegations of misconduct do not satisfy Rule 9(b)'s requirement to plead that false claims were made or false information was filed with the government).

B. *False Claims Act*

"The False Claims Act prohibits the submission of false or fraudulent claims to the federal government." Karvelas, 360 F.3d at 224 (internal citation omitted). Here, Plaintiff-Relator brings his False Claims Act cause of action under § 3729(a)(1)(A) and § 3729(a)(l)(B) of the statute. These provisions impose liability on a person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval, § 3729(a)(1)(A); and a person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," § 3729(a)(l)(B). "To be actionable, a false or fraudulent

statement must be material to the government's decision to pay a claim." United States ex rel. Escobar v. Universal Health Servs., Inc., 780 F.3d 504, 512 (1st Cir. 2015).[2] Under either theory of liability, a necessary element is that an actual false claim was submitted to the government. Karvelas, 360 F.3d at 225 ("[A]n actual false claim is the sine qua non of a False Claims Act violation.").

As the First Circuit has noted on several occasions, several circuits have distinguished express certifications of compliance with a payment condition from implied certifications of compliance with a payment condition, holding the latter theory of liability valid only where the implied certification is made to a legal condition of payment that is expressly stated in a statute or regulation. See United States ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 386 (1st Cir. 2011). The First Circuit, however, "has eschewed distinctions between factually and legally false claims, and those between implied and express certification theories, reasoning that they "'create artificial barriers that obscure and distort [the statute's] requirements.'" Escobar, 780 F.3d at 512 (quoting Hutcheson, 647 F.3d at 385). Instead, the First Circuit directs that "a broad view of what may constitute a false or fraudulent statement" be taken, id. (quoting United States ex rel. Jones v. Brigham & Women's Hosp., 678 F.3d 72, 85 (1st Cir. 2012)), and that the court "ask simply whether the defendant, in submitting a claim for reimbursement, knowingly misrepresented compliance with a material precondition of payment," id.

In Hutcheson and Escobar, the First Circuit made clear that "[p]reconditions of payment,

---

[2] Section 3730(b) of the statute provides that private persons, referred to as relators, may bring qui tam actions in the name of the United States for violations of the Act. Thus, although the claim itself is brought on behalf of the federal government, the United States is not a party to a privately filed action unless it intervenes in the relator's action in accordance with the Act. See United States ex rel. Eisenstein v. City of New York, 556 U.S. 928, 933 (2009). Here, the United States declined to intervene in Plaintiff-Relator Rodwell's action. Notice of United States of America of Election to Decline to Intervene [#41].

8

which may be found in sources such as statutes, regulations, and contracts, need not be 'expressly designated.'" Escobar, 780 F.3d at 512 (citing Hutcheson, 647 F.3d at 387–88). "Rather, the question whether a given requirement constitutes a precondition to payment is a 'fact-intensive and context-specific inquiry,' involving a close reading of the foundational documents, or statutes and regulations, at issue." Id. 512–13 (internal citation omitted). To cabin the potentially wide breadth of liability that the False Claims Act may therefore impose, the First Circuit directs the district courts to strictly enforce the Act's materiality and scienter requirements. Hutcheson, 647 F.3d at 387–88.

"A false statement is material if it has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.'" Id. at 394 (quoting United States ex rel. Loughren v. Unum Grp., 613 F.3d 300, 306–07 (1st Cir.2010)). In the context of a person's failure to abide by contractual provisions, "[e]xpress contractual language may 'constitute dispositive evidence of materiality,' but materiality may be established in other ways, 'such as through testimony demonstrating that both parties to the contract understood that payment was conditional on compliance with the requirement at issue.'" United States v. Sci. Applications Int'l Corp. (SAIC ), 626 F.3d 1257, 1269 (D.C. Cir. 2010). At the motion to dismiss stage, a plaintiff must show that non-compliance with a contractual provision was capable of influencing the government decision to pay. Karvelas, 360 F.3d at 394–95.

C. *Rule Application*

Excelitas makes two principal arguments in support of their motion to dismiss. First, it argues that the complaint does not identify any false claims submitted to the government, never mind provide particular details about such claims as required by Rule 9(b). Second, it argues that, with respect to Rodwell's argument that Defendants falsely certified that the thyratrons it

9

sold complied with certain requirements and standards, he has not shown that such compliance was a precondition of payment. Because these arguments attack the presentment and falsity elements of the FCA claim, they apply with equal force to Rodwell's allegations under §§ 3729(a)(1)(A)-(a)(l)(B) of the statute. See United States ex rel. Booker v. Pfizer, Inc., 9 F. Supp. 3d 34, 53, 59 n.9 (D. Mass. 2014) ("While underlying fraudulent conduct, however, may constitute 'false statement[s]' for purposes of § 3729(a)(1)(B), such conduct does not in and of itself establish the 'false or fraudulent claim' required for liability under both §§ 3729(a)(1)(A) and (B).").

(1) Presentment

Taking, first, the element of presentment, Excelitas argues that the complaint does not allege any details concerning particular false claims for payment. The complaint is flawed, according to Excelitas, because "it contains no allegations linking the alleged misconduct to the submission of any false claim for payment." Mem. Law Supp. Mot. Dismiss, 1 [#58]. After careful review of the complaint, however, the court finds that certain allegations in the complaint adequately plead that Excelitas presented claims to the Government.

Rodwell alleges that Defendants were awarded numerous contracts for the sale of thyratrons though the Government's competitive bidding process and that Defendants sold to the Government and government contractors over 10,000 thyratrons worth over $13 million. Compl. §§ 4, 12, 22. Specifically, he alleges that approximately 4,859 thyratrons were sold directly to the government and that the total value of government contracts awarded to Defendants over the last six years was approximately $4,386,631.22. Id. §§ 22, 34. He also lists a number of contracts by number which he claims were awarded to Defendants. See id. § 33. Rodwell generally alleges that "the Government executed multiple purchase orders, exercised options to

extend indefinite quantity contracts, and made payments to the Defendants." Id. § 36.

Rodwell does not specifically allege the date or general timeframe during which these contracts were awarded, id. § 33, but does provide more detail with respect to the following specific batches of thyratrons:

1. "Between March 12, 2010 and February 13, 2012, Excelitas sold at least 351 HY-10R thyratrons to the Government at a cost of $424, 577.22." Id. § 97.

2. "Between June 2006 and January 2012, Excelitas sold at least 1,367 HY-11T thyratrons to the Government at a cost of $1,637,589." Id. § 99.

3. "Excelitas sold at least 148 HY-5G thyratrons to the government at a cost of over $397,000." Id. § 121.

Rodwell does not identify any particular claim or invoice submitted to the Government. The court finds, however, that at least with respect to the above-mentioned batches of HY-10R, HY-11T, and HY-5G thyratrons, this omission is not fatal, particularly where Rodwell lacks access to the company's billing records. In United States ex rel. Goulden v. BAE Systems, the defendants made a similar argument where the plaintiffs in that case had identified several fixed-price contracts with the U.S. Army and provided the approximate value for each contract. See 2014 WL 3897645, *6 (D. Mass. Aug. 7, 2014). There, the court held that the plaintiff had satisfied the first element of presentment, explaining that

> It requires no stretch of the imagination to infer that [the defendant] sought and obtained at least some payments for the work it performed under its very lucrative contracts and, under the theory advanced by the relator, any and every invoice submitted pursuant to the contracts would be a false claim because it would certify that testing performed in exchange for payment complied with certain conditions.

Id. (emphasis in original). Here, as to the HY-10R, HY-11T, and HY-5G batches of thyratrons listed above, Rodwell provides similar details concerning the approximate date, quantity, and

11

value of thyratrons sold to the Government. In light of these details, the court finds that Rodwell has adequately plead that Excelitas presented claims to the Government. Cf. Ge, 737 F.3d at 121–25 (finding that the plaintiff had failed to allege submissions of false claims where she provided, "at most, aggregate expenditure data . . . with no effort to identify specific entities who submitted claims or government program payers, much less times, amounts, and circumstances.").

(2) Falsity

Excelitas does not dispute that Rodwell adequately alleges that it engaged in certain fraudulent acts connected to the assembly and testing of thyratrons. Excelitas challenges, however, the connection between such conduct and the submission of false claims to the Government. Rodwell responds by stressing that Defendants submitted claims for defective products that did not meet material contractual requirements, which resulted in a false claim.

Rodwell is correct to the extent that preconditions of payment need not be expressly stated in a contract. See Escobar, 780 F.3d at 512 (citing Hutcheson, 647 F.3d at 387–88). As explained above, Rodwell must, however, plead that the contractual requirements at issue were material to the government's payment of a claim, i.e., that non-compliance with a contractual provision was capable of influencing the government decision to pay.

As relevant to this inquiry, Rodwell first alleges that "[t]he contracts awarded to the Defendants require that the thyratrons sold by the Defendants meet NSN, Mil-Spec, and industry standards and require 100 percent quality control testing" as well as mandatory aging periods. Compl. § 9. Rodwell later expands on this allegation, alleging that the contracts at issue were awarded to Defendants through the competitive bidding program and that "solicitations published by the Government generally request a certain quantity of a particular model of

12

thyratron identified by its National Stock Number ("NSN")." Id. §§ 22-23. He then alleges that "NSNs . . . frequently . . . refer to Mil-Spec requirements or industry standards, such as those published by the international Electronic Industries Alliance "EIA" standards." Id. § 28. All of the thyratrons that Defendants sold to the Government, according to Rodwell, have NSNs and "[m]ost also have Mil-Spec or are also subject to EIA standards. Id. § 29. Rodwell claims that in submitting quotations or bids in response to the government's solicitations, Defendants certified that the thyratrons they would supply would comply with NSN, Mil-Spec, or EIA standards. Id. § 31. The Government allegedly relied on these certifications in awarding Defendants numerous contracts. Id. § 32.

Rodwell also alleges that while exploring information made available on a company computer, he viewed several contract documents and other specifications "requiring 100 percent quality control testing." Id. § 115. He was "able to read enough information to determine that there is no flexibility in the testing and aging requirements." Id.

Other than generally alleging that the contracts at issue were subject to NSN, Mil-Spec, and industry standards and subject to 100% quality control testing, Rodwell provides no details as to which specific specifications, standards, or testing the contracts required. Moreover, save for the requirements for Jitter Testing and a 96-hour holding period, which is alleged to be found in MIL-PRF-1/1612B and Mil-Prf-1/1612B, respectively, see id. §§ 140, 142, Rodwell does not identify any other specification or standard by number.

Standing alone and on a Rule 9(b) standard, such omissions would ordinary be fatal to a relator's complaint. Here, however, the complaint contains additional allegations sufficient to show that alleged fraudulent conduct as to specific batches of thyratrons constituted material noncompliance with contractual provisions.

13

As to the batch of HY-5G thyratrons, Rodwell alleges that they exhibited latching problems and repeatedly failed the DC Aging process. Id. § 104. Rodwell further alleges that his supervisor then recorded false testing information for the HY-5Gs and sent the defective product to the Government. Id. § 119. The product allegedly failed in the field, triggering a government audit. Id. § 120. Rodwell further explains that the audit was to be conducted on December 22, 2011, id. § 146, and that around that time, he attended a departmental meeting in which his supervisor stated that "we need to pull all the previous data for the HY-5s," id. § 147. Rodwell then alleges how his supervisor "appeared to change testing data and backfill missing information from previously shipped orders." Id. § 149. He alleges that he overheard his supervisor state that the company could get into "much trouble" if the audit revealed all of its problems. Id. § 153.

These allegations buttress Rodwell's more general claims that the contracts at issue with respect to the batch of HY-5Gs were subject to certain specification, industry standards, and/or quality control testing. Rodwell's detailed allegations of the company's alleged cover up with respect to the HY-5Gs are sufficient to demonstrate that such standards and testing were "capable of influencing the government decision to pay," Karvelas, 360 F.3d at 394–95.

### (3) PerkinElmer

As the above recitation of Rodwell's factual allegations show, the complaint contains no particularized allegations that PerkinElmer engaged in fraudulent conduct or submitted false claims to the Government during the time period in which Rodwell was employed with Excelitas. The only allegation concerning PerkinElmer is contained in paragraph 14 of the complaint, which alleges that Rodwell "learned from his co-workers that the violations of the FCA described in this complaint have been ongoing for at least the past 13 years, including

14

during the times that Excelitas was owned and operated by PerkinElmer." Compl. ¶ 14.  This allegation does not set forth a sufficient factual basis for the claim and is, therefore, insufficient to satisfy Rule 9(b)'s pleading standard.

IV. Conclusion

Based on the foregoing, Rodwell has satisfied the elements of a False Claim Act claim with respect to the batch of HY-5Gs thyratrons.  Accordingly, Excelitas' Motion to Dismiss [#57] is DENIED and PerkinElmer's Motion to Dismiss [#69] is ALLOWED.

IT IS SO ORDERED,

June 16, 2015

/s/ Indira Talwani
United States District Judge